# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JOSEPH ANTONETTI,

    *Petitioner*,

vs.

DWIGHT NEVEN, *et al.*,

    *Respondents*.

2:09-cv-01323-PMP-GWF

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the grounds that remain.

## Background

Petitioner Joseph Antonetti a/k/a Joseph Gozdziewicz seeks to set aside his 2007 Nevada state conviction, pursuant to a jury verdict, of one count of attempted escape and one count of possession by a prisoner of tools to escape.  Petitioner represented himself at trial, but he was represented by counsel on direct appeal. He thereafter pursued a *pro se* state petition for post-conviction relief.

## Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that a decision was incorrect.

131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

A state court decision on the merits is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).  A decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  540 U.S. at 16.  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.*, *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.  Rather, AEDPA requires substantially more deference to the state court's determination:

1     . . . . [I]n concluding that a state-court finding is unsupported by
2     substantial evidence in the state-court record, it is not enough that
      we would reverse in similar circumstances if this were an appeal
3     from a district court decision. Rather, we must be convinced that
      an appellate panel, applying the normal standards of appellate
4     review, could not reasonably conclude that the finding is
      supported by the record.

5    *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

6       Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct

7    unless rebutted by clear and convincing evidence.

8       The petitioner bears the burden of proving by a preponderance of the evidence that

9    he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

10                     ***Discussion***

11   ***Ground 2:  Effective Assistance of Appellate Counsel – Brady Claim***

12      The Court addresses Ground 2 before Ground 1 because Petitioner must demonstrate

13   ineffective assistance of appellate counsel under Ground 2 in order to overcome the

14   procedural default of the underlying substantive claim in Ground 1.

15      In the exhausted portion of the underlying substantive claim in Ground 1, Petitioner

16   alleges that he was denied due process in violation of the Fifth, Sixth, and Fourteenth

17   Amendments because the state district court denied pretrial motions allegedly requesting

18   discovery of files from the Federal Bureau of Investigation (FBI), two inspectors general, and

19   the Las Vegas Metropolitan Police Department ("Metro") gang intelligence unit containing

20   information and informant names regarding an alleged Aryan Warrior gang "contract" put out

21   on Antonetti. Petitioner contends that this discovery would have provided material evidence

22   for a necessity defense to the escape-related charges.

23      In the exhausted portion of Ground 2, Petitioner alleges that he was denied effective

24   assistance of appellate counsel for failure to raise the claim in Ground 1 on direct appeal.

25      The Supreme Court of Nevada rejected the ineffective-assistance claim presented to

26   that court on the following grounds:

27        Appellant claimed that his appellate counsel was
28    ineffective for failing to argue that the prosecutor committed
      misconduct when the prosecutor failed to turn over evidence.

1
2
3
4
5

Appellant asserted that he had filed pretrial motions requesting material evidence in support of his defense strategy, including files from the Inspector General's Office, files from gang intelligence, files from the police, and Clark County investigators. Appellant claimed that these sources would reveal information about a prison gang that appellant alleged posed a threat to his life. Appellant finally asserted that he had a "good reason to suggest a great deal of evidence exist[ed] that was not turned over."

6
7
8
9
10
11
12
13
14
15

Appellant failed to demonstrate that his appellate counsel's performance was deficient or that he was prejudiced. Brady v. Maryland, 373 U.S. 83 (1963) requires a prosecutor to disclose material evidence favorable to the defense. See Evans v. State, 117 Nev. 609, 626, 28 P.3d 498, 510 (2001). Appellant's claim of misconduct was based on a bare and naked allegation that the prosecutor withheld evidence, and notably, appellant failed to demonstrate that any evidence was withheld from the defense in the instant case. Throughout the pretrial proceedings appellant argued that the prosecutor had not disclosed all of the evidence, and the prosecutor stated that the evidence in their files had been turned over to appellant and his former trial counsel. A number of continuances were granted to provide appellant access to the prosecutor's files. Appellant presented his defense theory regarding the alleged gang threats to the jury. Appellant failed to demonstrate that this issue of prosecutorial misconduct would have had a reasonable probability of success on direct appeal. Therefore, we conclude that the district court did not err in denying this claim.

16  #23, Ex. 97, at 2-3.

17  The state supreme court's rejection of this claim was neither contrary to nor an
18  unreasonable application of clearly established federal law.

19  On a claim of ineffective assistance of counsel, a petitioner must satisfy the
20  two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate
21  that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)
22  counsel's defective performance caused actual prejudice. On the performance prong, the
23  issue is not what counsel might have done differently but rather is whether counsel's
24  decisions were reasonable from his perspective at the time. The court starts from a strong
25  presumption that counsel's conduct fell within the wide range of reasonable conduct. On the
26  prejudice prong, the petitioner must demonstrate a reasonable probability that, but for
27  counsel's unprofessional errors, the result of the proceeding would have been different. *E.g.,*
28  *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

-4-

1     While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review

2   is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court

3   must take a "highly deferential" look at counsel's performance through the also "highly

4   deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

5     When evaluating claims of ineffective assistance of appellate counsel, the performance

6   and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263

7   F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

8   Effective appellate advocacy requires weeding out weaker issues with less likelihood of

9   success.  The failure to present a weak issue on appeal neither falls below an objective

10  standard of competence nor causes prejudice to the client for the same reason – because the

11  omitted issue has little or no likelihood of success on appeal.  *Id.*

12    As backdrop in the present case, Antonetti was charged in November 2003 with the

13  September 17, 2003, escape offenses.  Antonetti attempted to escape from the Clark County

14  Detention Center (CCDC).  Although the reason for his detention was excluded from evidence

15  at trial in the escape case, Antonetti attempted to escape while awaiting trial for, *inter alia*,

16  first-degree murder with the use of a deadly weapon in a case where the State was seeking

17  the death penalty.  He was charged with attempting escape with four other pretrial detainees

18  also held on felony charges, including one of his codefendants in the murder case.  He thus

19  was represented by counsel in the murder case at the time of the escape attempt.[1]

20    On the escape charges, Antonetti was represented by appointed counsel from

21  December 15, 2003, until May 4, 2005, when the court granted his motion to represent

22  himself with former counsel as standby counsel.  At the time that Antonetti opted to represent

23  himself, he was incarcerated on, *inter alia*, two consecutive sentences of life without the

24  possibility of parole.[2]  Moreover, his custodians quite likely would be taking his escape attempt

25  into account vis-à-vis security and his conditions of confinement.

26  _____

27    [1]E.g., #22, Exhs. 2-6; #23, Ex. 80, at 12; No. 3:11-cv-00451-RCJ-WGC, #16, Exhs. 6-7 & 26.

28    [2]See #22, Exhs. 4, 7, 23-24 & 26 (representation issues); see also *id.*, Ex. 59, at 11 (other sentence).

Prior to Antonetti opting to represent himself, a defense investigator had been appointed.  Prior to his self-representation, Antonetti had reviewed surveillance tapes and documents that the State was planning to introduce at trial with defense counsel and the investigator.[3]

At the time that the court granted Antonetti's request to represent himself, on May 4, 2005, Antonetti stated that he was not ready for trial because an Inspector Molnar had taken evidence from him without returning it.  Antonetti was referring to an investigative officer with the Nevada Department of Corrections (NDOC).  The court directed Antonetti to file a written motion, and standby counsel stated that she would assist Antonetti in doing so.  Antonetti further requested that he be returned from the jail to prison where he had access to a law library and supplies.  The court continued the trial date and granted Antonetti's request to be returned to prison.[4]

On July 20, 2005, standby counsel signed a receipt acknowledging delivery of a CD-ROM from the State with discovery disclosures.[5]

At a July 25, 2005, calendar call, Antonetti advised the court that Inspector or Investigator Molnar "still" had not returned any of the materials that he had taken, "including every name, phone number, [and] address in my possession."  Petitioner stated that he needed the information to contact witnesses on his behalf.  (Antonetti, however, was in the process of serving subpoenas on witnesses.)  He further stated that "some of the things he took are, I believe, exculpatory in nature."  Antonetti stated that the court had ordered Molnar to return the materials but had not done so.  However, the online docket record reflects that Antonetti in truth had not filed a written motion during the intervening nearly three months

---

[3]See #22, Exhs. 16-18.  While Exhibit 18 is an application for a contact visit after an unsuccessful attempt to meet with petitioner, the online docket record of the Eighth Judicial District Court confirms that the application was promptly granted.  It does not appear that further followup requests for a contact visit were required to accomplish the objective.  The online docket record for Case No. C196472 can be accessed from: https://www.clarkcountycourts.us/Anonymous/default.aspx.

[4]#22, Ex. 24.  See also *id.*, Ex. 29, at 1.

[5]#22, Ex. 27.

1    after the May 4, 2005, proceeding as the judge had directed.  The court directed the State to

2    contact Molnar to see if he had the materials to which Antonetti was referring.[6]

3        Also at the July 25, 2005, calendar call, the court and parties discussed the CD-ROM

4    provided by the State to standby counsel.  It would appear that the production in this format

5    would have been accessible for review and use by counsel in defending Antonetti had she

6    still been acting as defense counsel rather than only as standby counsel.  However, Antonetti

7    informed the court that he did not have a computer in prison and that he therefore could not

8    access the CD-ROM as a self-represented defendant.  He specifically asked for the State to

9    either put the material on an audio CD, as he had a CD player, or transcribe the material.  The

10    court directed that standby counsel see to such being done.  The court further continued the

11    trial again.[7]

12        On September 14, 2005, Antonetti filed a written motion for discovery and review of

13    *Brady* material.  Antonetti made broad requests for categories of documents rather than

14    requests for specific information.   He requested discovery and review "of all CCDC

15    investigator and classification officers, as well as N.D.O.P. inspector general and classification

16    officers, files, notes, reports, records, or documents for possible exculpatory and/or

17    impeachment material and/or evidence."  The motion otherwise recited boilerplate law on the

18    obligation of disclosure under *Brady*, including generic case law regarding a duty to disclose

19    any exculpatory or impeachment evidence "which can be obtained for all testifying witnesses,

20    including officers and agents controlling or having interviewed informants."[8]

21

_____

22        [6]#22, Ex. 29, at 2-3 & 5.  Petitioner at this point was not making a request for discovery of material in
State files but instead was seeking a return of his own files.  Although petitioner referred generically to some
23    of his own confiscated file materials as being "exculpatory," he presented no request at that time under *Brady*
for exculpatory material in the State's files.  Petitioner made no request  in particular regarding the identity of
24    informants concerning an Aryan Warrior contract on his life and/or for other specific information regarding
such an Aryan Warrior contract on his life.  See also note 8, *infra*.
25

26        [7]*Id*., at 2-4.

27        [8]#22, Ex. 32.  It of course is established law that the State owes the same duty of disclosure of
favorable (exculpatory and impeachment) evidence without regard to whether the defendant makes a specific
28                                                                                                    (continued...)

-7-

1       The court granted the motion for discovery of *Brady* material on September 26, 2005.[9]

2       Over seven months later, at a May 10, 2006, calendar call, Antonetti stated to the court

3   that he had not been given "any" materials in response to the motion for discovery of

4   *Brady* material.  He stated that "I know that there's evidence, you know, that is exculpatory

5   in nature" that the State had not provided.  When asked for an example, he referred to phone

6   calls by one of his codefendants in the escape case to another individual.  Both the

7   prosecutor and standby counsel confirmed that the phone calls had been produced by the

8   State.  Antonetti maintained conclusorily that he had "everything that's inculpatory . . . but not

9   everything that's exculpatory."  The State affirmed again that recordings of all phone calls, not

10  just the phone calls that the prosecution was introducing into evidence, had been produced.

11  Antonetti continued to maintain that he had asked for "exculpatory evidence" in the motion

12  and that "[i]n my motion I pointed out exactly where they should look."  He did not establish

13  that any specific exculpatory evidence had been withheld, over and above making for the

14  record his unsupported conclusory assertion that exculpatory evidence had been withheld.[10]

15      However, at a May 24, 2006, calendar call, Antonetti and standby counsel advised the

16  court that the State had informed counsel that the recording of 150 additional phone calls had

17  been given previously to Petitioner's counsel in the murder case.  The State was in the

18  process of having the recording converted to a cassette tape, or per Antonetti's request, an

19  audio CD for Antonetti to be able to review the calls.  Antonetti maintained that he had

20  preliminary listened to the calls on apparently a CD-ROM that standby counsel had.  He

21  asserted that the material was "obviously exculpatory, it's obviously going to be useful for my

22

23      [8](...continued)

24  request, a general request, or even no request at all.  However, petitioner has suggested repeatedly in state
    and federal court that he specifically asked for information regarding an Aryan Warrior contract on his life.
    Such a suggestion is belied by the state court record.  Petitioner made no targeted express request in the

25  *Brady* motion, or otherwise, specifically for the identity of informants regarding an Aryan Warrior contract on
    his life and/or for other specific information regarding such an Aryan Warrior contract on his life.  The Court

26  notes this to keep the record clear as to what in fact transpired in state court.

27      [9]#22, Ex. 37.

28      [10]#22 Ex. 51, at 3-8.

1    defense." The court vacated the trial date without date to afford Antonetti time to review the
2    recording after being transferred back to prison.[11]

3            On July 10, 2006, Petitioner filed a motion to dismiss the charges. Antonetti made
4    conclusory assertions, *inter alia*, that the State had failed to meet its disclosure obligations
5    despite the court's grant of his *Brady* motion and that the inspector general's office had
6    confiscated evidence and discovery materials.[12]

7            No specifics were offered in the motion in support of the bare assertion that the State
8    had failed to disclose materials years into the case. No mention was made regarding the
9    withholding of any information or materials regarding an Aryan Warrior contract on Antonetti's
10   life.

11           Further, no specifics were offered in the motion in support of the bare suggestion that
12   there remained a continuing issue regarding the the inspector general confiscating evidence
13   and discovery. Petitioner never had filed a written motion to obtain the materials allegedly
14   confiscated by Inspector Molnar after initially raising the issue more than fourteen months
15   before. Petitioner never even had mentioned the alleged confiscation in any state court
16   proceedings of record herein after a July 25, 2005, calendar call – which appeared to direct
17   a solution to that issue. Moreover, Petitioner thereafter had named a total of seven witnesses
18   in a September 22, 2005, witness list and another seven witnesses in an April 17, 2006,
19   witness list, after previously stating to the state district court that he needed the materials
20   allegedly taken by Molnar to identify and list his witnesses.[13] Nothing in the conclusory
21   reference -- seemingly back to the same previously apparently resolved situation -- gave any
22   specifics reflecting how or why there remained any continuing issue in this regard.

23   _____

24           [11]#22, Ex. 54, at 4-6. Petitioner made no request at either the May 10, 2006, or the May 24, 2006,
     calendar call for discovery of *Brady* material specifically for the identity of informants regarding an Aryan
25   Warrior contract on his life and/or for other specific information regarding such an Aryan Warrior contract on
     his life. He made no assertion at either calendar call that information regarding an Aryan Warrior contract on
26   his life was being withheld by the State. See note 8, *supra*.

27           [12]#22, Ex. 55, at 5-6.

28           [13]#22, Exhs. 35 & 48.

1  At a August 9, 2006, status check, the State produced recordings of phone calls or

2  additional phone calls on an audio CD.  Antonetti argued on the motion to dismiss that "I filed

3  a motion specifically asking for the phone calls years ago," although his *Brady* motion had not

4  asked specifically for phone calls.  He further referenced his general request for exculpatory

5  material.  Petitioner additionally made a conclusory reference to his discovery materials being

6  confiscated.    Petitioner  once  again  made  no  reference  in  his  argument  to  allegedly

7  suppressed evidence concerning an Aryan Warrior gang contract on his life.[14]

8  The State responded that all of the material originally had been turned over to counsel

9  for Antonetti before he undertook self-representation.  According to the State, it had taken a

10  month  and  a  half  to  convert  the  material  turned  over  that  day  from  the  prior  CD-ROM

11  production onto an audio CD.[15]

12  Antonetti confirmed at an August 16, 2006, status check the following week that he

13  could  access  the  recordings  on  the  audio  CD.    He  requested  transcripts  of  all  pretrial

14  proceedings "so that I can show that I have asked in the past for exculpatory evidence, Brady

15  and Giglio material, impeachment material . . . [that] I just continuously maintain that there is

16  more evidence that has not been turned over."[16]

17  The matter came on for trial beginning on December 5, 2006.  During his reserved

18  opening statement after the State's case-in-chief, Antonetti articulated openly for the first time

19  his necessity defense based upon an alleged contract on his life.  He did not deny that he

20  attempted to escape, but he maintained that he did so because his life was in danger.[17]

21  In his case-in-chief, Antonetti presented multiple witnesses seeking to substantiate this

22  defense, which he had the burden of proving by a preponderance of the evidence.

23

24  [14]#22, Ex. 59, at 2-7.  It appears that the attorney initially making the in-hearing presentation was not
25  regular counsel on the file, with lead counsel thereafter clarifying what was being produced in what format a
few minutes into the hearing.

26  [15]*Id.*, at 12-13.

27  [16]#22, Ex. 61, at 2-4.

28  [17]#23, Ex. 70, Part 1, at 101-02.  Petitioner apparently had been "playing his cards close to the vest."

-10-

Veronica Damon was an investigator with the NDOC Inspector General's office.  She had knowledge of Antonetti "from back to 2004" while assigned as an institutional investigator at High Desert State Prison ("High Desert").[18]  Significantly, Damon testified that she did not have any knowledge of Antonetti at the time of his attempted escape from CCDC in September 2003, and she was not aware of any threats against him at that time.[19]  Antonetti sought to elicit testimony from Damon that she had told him that a gang had "bad intentions" for him.  Damon did not recall the 2004 conversations the way that Antonetti recalled them. She recalled that when he asked her why he was on walk-alone status she told him "the various reasons a person could be placed on walk alone status."[20]  She acknowledged that Antonetti had been placed on walk-alone status, in 2004, due to a threat. [21]  However, her recollection was that she did not communicate that information to Antonetti, including during a conversation that she had with Antonetti with inmate Jack McLaughlin also present.[22]

Damon could not recall "if the threat came in paper form or information" given that "90 percent of the information that we get that comes into the office is given in an anonymous format."  Damon stated that "liability procedures dictate [that] we take action based on the possibility that a threat does exist."  She testified that there would be a "chronological [entry] under your BAC [inmate] number indicating that you were placed on walk alone status per the [Inspector General's] office."  The entry would state "[f]or threats and that's all it does on the chronological record."  She did not recall any specifics on the 2004 High Desert threat.[23]

/ / / /

---

[18]#35, Ex. 102, at 89.

[19]*Id.*, at 94-96.

[20]*Id.*, at 88-91.  See also *id.*, at 95 (possible reasons for walk-alone status).  Walk-alone status, as the name implies, "means that when you're taken out of your cell, there are no other inmates out of their cells in the area at the time."  *Id.*, at 93.

[21]*Id.*, at 91-92.

[22]*Id.*, at 89-91 & 94.

[23]*Id.*, at 91-94.

1      The next morning, outside of the presence of the jury, Antonetti urged that Damon's

2  testimony confirmed that the State had withheld favorable evidence.  He maintained that

3  "[i]nside the [*Brady*] motion, I . . . asked for the government examination of files of the

4  investigator, the inspector general, the Metro gang intelligence files for [the] very information

5  that I was trying to receive from [State witness] Miss Damon yesterday."  He maintained that

6  he thus was unable to help the witness refresh her recollection as to events three years

7  before.[24]

8      The prosecution stated that it did not have any of the materials and had no exculpatory

9  evidence.  The parties debated whether Damon had testified that she had any notes in the

10  first instance.[25]  The transcript of Damon's testimony confirms that Antonetti did not ask her

11  whether she had any notes and that she did not testify as to the existence of any such

12  notes.[26]

13      The Court further observes that:  (a) under a fair reading of Damon's testimony, she

14  did not testify that she was unable to recall her conversations with Antonetti but instead simply

15  that she did not recall the substance of the conversations the same way that he did;  (b) her

16  inability to recall specifics regarding a possible threat at High Desert in 2004 had no material

17  bearing on Antonetti's attempt to escape from CCDC in 2003, including regarding what he

18  knew then as she did not know or talk to him then; and (c) her testimony in any event further

19  tended to reflect that a detailed paper trail was not maintained by NDOC with regard to "90

20  percent of the information" that her office acted on based upon anonymous oral information,

21  given that NDOC had to act to protect the inmate from the possibility of a threat regardless.

22

23

24      [24]#23, Ex. 73, at 3-4.  The State of course has an obligation to produce favorable information in any
files under the State's control, whether requested or not.  The Court notes that, while the *Brady* motion had
requested discovery of CCDC and NDOC investigative and classification officers' files and notes for possible

25  exculpatory evidence, the motion made no express reference to Metro gang intelligence files and/or other
gang-related information.  Antonetti's argument therefore was not factually accurate as to what he had

26  expressly requested in his *Brady* motion.

27      [25]#23, Ex. 73, at 4-5.

28      [26]#35, Ex. 102, at 87-96.

1    Ronald Sellers, a High Desert inmate, testified that he was "alleged to be the leader

2    of" the Aryan Warrior prison gang.  Sellers testified that – "at some point or another," without

3    regard to any identified specific time period – "my intention was that we were going to have

4    to kill [Antonetti]."  He further testified that the Aryan Warriors could get to an inmate in

5    protective custody and that Antonetti was aware that the gang could do so.[27]

6    Kevin Strobeck was a CCDC investigator.  Strobeck testified that he had heard that

7    someone had threatened Antonetti, and he believed that Antonetti was aware of the threat.

8    However, on cross-examination, Strobeck testified that, from what CCDC personnel knew,

9    the threat came from a person in prison rather than at the detention center and the threat

10   existed only in prison rather than at the detention center.  Strobeck testified that Antonetti had

11   made no requests to him or other CCDC personnel to be housed differently.     Antonetti

12   sought to establish on redirect that it would not have been necessary for him to inform

13   Strobeck of the threat because Strobeck already was aware of the threat.  However, this

14   begged the question on the point being made by the prosecution, and Strobeck reiterated on

15   that point that Antonetti had made no request to be moved within CCDC.[28]

16   Michael Oxborrow was a correctional case worker at Ely State Prison ("Ely").  He

17   testified, *inter alia*, that "99.9 percent of the time" inmates were safe in protective custody but

18   "there's no guarantee."  Ely was a maximum security facility, so it housed offenders capable

19   of violence, including Aryan Warrior members.  He personally was not aware of any threats

20   against Antonetti.  He did not come into contact with Antonetti until 2004, so he would not

21   have had any interaction with Antonetti when he was in CCDC during the relevant time in

22   2003.[29]

23   The parties stipulated to the testimony of State witness Detective Alexander Gonzalez

24   if he were recalled by Antonetti in his case-in-chief.  Gonzalez was a Metro intelligence officer

25

26        [27]#23, Ex. 73, at 9-14.

27        [28]*Id.*, at 17-20.

28        [29]*Id.*, at 21-27.

1   employed at CCDC.  As related by Antonetti, the stipulation was that Gonzalez would testify
2   that he took Antonetti to a meeting "to be instructed by gang intelligence that there was a
3   contract on my life while I was present here in the Clark County Detention Center."[30]

4          Antonetti's mother, Kim Kuehnert, testified that she and a Jaime Heller was afraid that
5   Antonetti was going to be hurt, that "a female District Attorney" told her "one day" that there
6   might be a problem, and that his attorneys wanted him to cut a deal where he would not be
7   incarcerated in Nevada due to the alleged threat.[31]

8          Jack McLaughlin, one of Antonetti's co-conspirators in the escape, testified that
9   Antonetti was trying to escape because the Aryan Warriors were threatening his life and that
10  Antonetti told him this.  According to McLaughlin, he was present when High Desert
11  investigator Damon told Antonetti that there were credible threats against his life and that the
12  threat was imminent.  McLaughlin did not testify when the conversation with Damon at High
13  Desert occurred, however.  He did not contradict Damon's testimony that she conversed with
14  Antonetti in 2004, well after his attempted escape from CCDC in 2003.[32]

15         Under the applicable jury instruction, Antonetti had the burden of proving by a
16  preponderance of the evidence that he was faced with a specific threat of, *inter alia*, death
17  or substantial bodily injury in the immediate future, that there was no time for a complaint to
18  the authorities or there existed a history of futile complaints, and there was no time or
19  opportunity for resort to the courts.[33]

20         In its closing argument, the State focused on the testimony that the threat was in prison
21  rather than at the jail and that Antonetti did not request a change in housing at CCDC.  The
22  State further noted that Antonetti had not established that he did not have time or opportunity

---

24  [30]#23, Ex. 73 at 28.  See also #35, Ex. 102, at 26-42 (Gonzalez' testimony in State's case-in-chief).

25  [31]#23, Ex. 73, at 33-36.

26  [32]*Id.*, at 37-47.

27
28  [33]See #23, Ex. 75, Instruction No. 21; see also #23, Ex. 74, at 2-5 & 23-24  (stipulation to additional factor and agreement as to irrelevancy of another remaining factor).

-14-

1  for resort to the courts.  The State also argued in rebuttal that Antonetti's demeanor in eight

2  to ten telephone calls with the young women outside the jail who were assisting the escape

3  was not consistent with his defense.  The State maintained that he did not appear worried or

4  upset, that he instead was joking with the women while planning the escape, and that he

5  never mentioned a threat on his life or that he had to escape because his life was in danger.[34]

6       After the trial and guilty verdict, Antonetti filed a post-trial motion for mistrial on a

7  number of grounds.  Petitioner made conclusory assertions, *inter alia*, that the State failed to

8  produce exculpatory evidence and that "[d]ue to various witness testimony . . . it is obvious

9  such evidence exists and that witness recollection was indeed an issue."[35]

10      The state district court denied the motion, finding, *inter alia*, that the State had not

11  withheld any exculpatory evidence.[36]

12      Appointed appellate counsel thereafter did not raise an issue on direct appeal

13  regarding an alleged failure to produce exculpatory evidence.

14      In his state petition, Antonetti claimed ineffective assistance of appellate counsel for

15  failing to raise the following substantive *Brady* claim:

>Mr. Antonetti filed several motions in request of material evidence in support of his defense strategy, both written and verbal. This evidence was never given to Mr. Antonetti. Evidence from files of inspector generals, gang intelligence Metro, Clark County investigators, as to the whereabouts, abilities, confidential informants of a prison gang, Aryan Warriors, with which Mr. Antonetti could have shown that a threat to his life existed anywhere in Nevada, which goes directly to his defense strategy. Mr. Antonetti has very good reason to suggest a great deal of evidence exists and was not turned over as the media knows of federal and state agencies having indictment against said group. Further several witnesses could not recall information that copies of their files would have assisted with.  This deprived Mr. Antonetti of a fair trial.

24  #23, Ex. 92, at 8.

---

26  [34]#23, Ex. 74, at 28-36.

27  [35]#23, Ex. 78, at 5-6.

28  [36]#23, Ex. 80, at 11.

1    As noted previously, the Supreme Court of Nevada held that Petitioner could not

2    demonstrate either that appellate counsel's performance was deficient or that he was

3    prejudiced by the failure to present this substantive claim on direct appeal.  This holding was

4    neither contrary to nor an objectively unreasonable application of *Strickland* and other clearly

5    established federal law as determined by the United States Supreme Court.

6    Under *Brady* and its progeny, a defendant is denied due process if:  (1) the State

7    suppresses evidence either willfully or inadvertently; (2) the suppressed evidence is favorable

8    to the accused, either as exculpatory or impeachment evidence; and (3) the defendant was

9    prejudiced because the suppressed evidence was material, *i.e.*, there was a reasonable

10   probability that, had the evidence been disclosed, the result of the proceeding would have

11   been different.  *See,e.g., Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012), *petition*

12   *for cert. filed*, 81 U.S.L.W. 3429 (Nov. 15, 2012).

13   The state supreme court's rejection of the claim of ineffective assistance of appellate

14   counsel on the ground that Petitioner presented only a bare claim that the State suppressed

15   evidence was not an objectively unreasonable application of clearly established federal law.

16   A defendant must do more than present a purely speculative claim that favorable information

17   was suppressed by the State, and he instead must produce some evidence of suppression.

18   *See,e.g., United States v. Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011); *Phillips v. Woodford*,

19   267 F.3d 966, 987 (9th Cir. 2001); *United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir.

20   1992).  Antonetti's conclusory assertions on state post-conviction review that "a great deal of

21   evidence exists" and that "several witnesses could not recall information that copies of their

22   files would have assisted with" were grounded in pure speculation.  Nothing in the state court

23   record -- including investigator Damon's testimony discussed at length, *supra* -- supports

24   Antonetti's bald supposition that extensive investigative files, notes, summaries of interviews

25   of informants, and the like existed containing material favorable information over and above

26   that which Antonetti presented at trial.  That is, the premise merely that a member or

27   members of a prison gang may have threatened a pretrial detainee does not inexorably lead

28   to the conclusion that multiple agencies developed extensive files on the alleged threat.

-16-

Antonetti never developed an actual factual foundation for a *Brady* claim in the state courts -- including in particular when he had officers on the stand at trial -- that extensive multiple agency investigative files existed regarding an alleged threat on his life by the Aryan Warriors in 2003 and that such alleged files contained material information over and above that presented at trial.[37]  Petitioner requests in the reply that this Court order production of the alleged files and require that State officials respond to his allegations at a federal evidentiary hearing.  Under *Pinholster*, however, federal review is restricted to the conclusory record that Antonetti made before the state courts that adjudicated the merits of his claim of ineffective assistance of counsel.  *E.g., Runningeagle*, 686 F.3d at 766 n.2; *Woods v. Sinclair*, 655 F.3d 886, 904 n.10 (9th Cir. 2011), *vacated on other grounds*, *Woods v. Holbrook*, 132 S.Ct. 1819 (2012).  The record that Antonetti made in the state court proceedings was one of repeatedly conclusory and speculative assertions that the State was withholding favorable information.  A conclusory and speculative claim does not become less so by repetition.[38]

---

[37]See also #44, at 18-22 (related record analysis in Respondents' Answer).

[38]Petitioner urges that this Court "has already noted it is unpersuaded that the claims are lacking in specificity."  #45, at 1.  However, the Court clearly distinguished between alleging a sufficiently specific claim in the federal petition to initially warrant a written response and review of the merits of the underlying claim:

> . . . . If the Court had been of the view that the Petition was not sufficiently specific to allow a response, it would have dismissed the claims with leave to amend during the active screening conducted herein.  The claims presented were exhausted in the state courts, and they were rejected by the Supreme Court of Nevada on the record presented to that court either on the merits or on the basis of a state procedural bar. The two fairly straightforward grounds presented in this matter thus would appear to be postured for a definitive resolution under the applicable standard of review under AEDPA or the procedural default doctrine. . . . .
>
> *The Court expresses no opinion at this juncture as to whether the decision of the Supreme Court of Nevada rejecting Ground 2 on the merits was neither contrary to nor an unreasonable application of clearly established federal law due to the claim being based on bare allegations in the state courts.  The Court holds only that the claims presented are sufficiently specific under the applicable federal pleading standard to require a response rather than dismissal with leave to amend.*

#41, at 1-2 (emphasis added).

1    In the Reply, Petitioner relies upon "Case Notes" from an "Offender Information
2    Summary" under his name and identification number that he maintains that he received in
3    response to a grievance.  The document consists of short, dated entries of two or more lines
4    in chronological order.  Petitioner relies in particular upon the following entry:

6              01/19/2005 - 09:47 [General Case Notes/General Case Note]
               TRIGGS - ACCORDING TO I.G.'S OFC (DAMON) I/M [inmate] IS
7              TO REMAIN ON WALK ALONE STATUS; I/M APPARENTLY
               HAS A HIT ON HIM & I.G'S OFFICE WANTS I/M TO STAY ON
               WALK ALONE STATUS.  I/M & 2B C/OS [Unit 2B correctional
8              officers] WERE ADVISED

9    #40, Ex. C (at electronic docketing pages 23-24).

10    Petitioner contends that this entry establishes on federal habeas review that he was
11    denied favorable information responsive to his *Brady* request with regard to investigator
12    Damon's testimony.  The entry does not do so.  First, the document was not presented to the
13    state courts that adjudicated the claim on the merits and therefore cannot be considered on
14    federal habeas review.  *Pinholster, supra.*  Second, the entry is addressed to an NDOC
15    inmate record concerning circumstances when he was in NDOC custody at High Desert on
16    January 19, *2005*.  Petitioner attempted to escape from CCDC on September 17, *2003*.  The
17    entry, which paralleled Damon's testimony, had no material exculpatory value vis-à-vis his
18    2003 escape attempt.  Third, the document did not have any material impeachment value.
19    Damon testified specifically that being placed on walk-alone status based upon a threat would
20    generate such  a chronological entry – and often only such a terse entry – under the inmate's
21    identification number.[39]  Even if some strained impeachment could be drawn from the entry,
22    such impeachment would be on collateral matters having nothing to do with the relevant time.
23    Damon interacted with Antonetti and the entries in his custodial file when he was in NDOC
24    custody at High Desert starting in 2004, not when he was in CCDC custody in 2003 when he
25    attempted to escape.  Petitioner's arguments regarding Damon's testimony in truth present
26    nothing more than a red herring, both as to guilt at trial and on the *Brady* issue.

27    _____

28        [39]See #35, Ex. 102, at 92-93.

-18-

1      Further, given the trial evidence, there was not a reasonable probability that the

2  *Brady* claim asserted by Antonetti would have succeeded on direct appeal.  Antonetti did in

3  fact present evidence at trial, including from State officers, tending to establish that there was

4  a threat on his life while at CCDC and that both Antonetti and officers knew about it.  *Cf. Ford*

5  *v. Gonzalez*, 683 F.3d 1230, 1238 n.10 (9th Cir.), *cert. denied*, 133 S.Ct. 769 (2012)(there is

6  no *Brady* violation where the defendant is aware of the essential facts enabling him to take

7  advantage of the favorable evidence).  However, proving the existence only of the threat itself

8  did not prove all of the required elements for Antonetti's necessity defense.  He additionally

9  was required to establish by a preponderance of the evidence that there was no time for a

10  complaint to the authorities or that there existed a history of futile complaints making any

11  result from such a complaint illusory *and* that there was no time or opportunity for resort to the

12  courts.[40]  Petitioner presented no evidence establishing these elements by a preponderance

13  of the evidence.[41]   Nor was such evidence – particularly as to his seeking relief from the

14  courts – reasonably likely to be established by anything in alleged multi-agency investigative

15  files.  What the trial evidence instead reflected – rather than, *e.g.*, Antonetti taking the time

16  to seek protection from custodial officers and the courts – was extensive advance preparation

17  by Antonetti for the escape attempt over the course of multiple telephone calls where he

18  made no reference to needing to escape to protect his life.[42]

19  _____

20      [40]#23, Ex. 75, Instruction No. 21.

21      [41]Evidence that officers knew of a threat, again, was not evidence that Antonetti requested that
   additional steps be taken by officers or that such requests would not have been considered if made.
22

23      [42]Petitioner proceeds on the highly questionable unstated premise that by presenting testimony
   seeking to establish that no inmate is 100% safe from a prison gang in any jail or prison, even when held in
24  protective custody, that he thus lawfully can escape without seeking protection from custodial officers or the
   courts.  Such a premise has no foundation in Nevada state law.  The fifth element of the necessity defense --
25  in cases where the inmate successfully escapes -- is that the inmate immediately report to the proper
   authorities when he has attained a position of safety from the immediate threat.  *E.g., Jorgensen v. State*, 100
26  Nev. 541, 543, 688 P.2d 308, 309 (1984).  Quite obviously, compliance with this element will result in the
   escapee being taken back into custody, albeit under safer conditions.  The law clearly does not contemplate
27  that authorities in effect instead will say to a capital murder defendant that there is no way to 100% guarantee
   anyone's safety and that he therefore is free to go on about his way, hopefully to return for trial.  The clear
28                                                                                      (continued...)

-19-

1    The state supreme court's rejection of the bare claim of ineffective assistance of

2    appellate counsel presented to that court, for failing to raise such a weak *Brady* claim,

3    accordingly was neither contrary to nor an objectively unreasonable application of clearly

4    established federal law.

5    The claim of ineffective assistance of appellate counsel in Ground 2 therefore does not

6    provide a basis for federal habeas relief.

7    ***Ground 1:  Procedural Default of Substantive Brady Claim***

8    On state post-conviction review, the Supreme Court of Nevada held that the

9    substantive *Brady* claim now presented in federal Ground 1 was procedurally barred under

10   N.R.S. 34.810(1)(b) because the claim could have been raised on direct appeal.[43]

11   Under the procedural default doctrine, federal review of a habeas claim may be barred

12   if the state courts rejected the claim on an independent and adequate state law ground due

13   to a procedural default by the petitioner.  Review of a defaulted claim will be barred even if

14   the state court also rejected the claim on the merits in the same decision.  Federal habeas

15   review will be barred on claims rejected on an independent and adequate state law ground

16   unless the petitioner can demonstrate either: (a) cause for the procedural default and actual

17   prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of

18   justice will result in the absence of review.  *See,e.g.,Bennett v. Mueller*, 322 F.3d 573, 580

19   (9th Cir. 2003).

20   / / / /

21

22      [42](...continued)

23   purpose of the necessity defense instead is so that a prisoner facing an immediate threat will be able to
     protect himself when there is no time to seek help from correctional officers, or they have refused such help,

24   and there is no time to seek help from the courts.  Taken to its logical extreme, under Petitioner's argument,
     every prisoner who had a gang enemy in prison – hardly an infrequent occurrence – would have a lawful

25   justification to escape from any and all custodial facilities because no one's safety in protective custody can
     be guaranteed to a 100% certainty.  That does not appear to be the law in Nevada.  In other words, merely

26   being the target of a gang threat in prison does not provide a prisoner a "get out of jail free" card on the
     premise that there is no way to absolutely assure an inmate's safety in custody.  The inmate instead must

27   seek protection from custodial officers and the courts.

28      [43]#23, Ex. 97, at 2 n.2.

-20-

1
2
3
4
5
6

To demonstrate cause, the petitioner must establish that some external and objective factor impeded efforts to comply with the state's procedural rule.  *E.g., Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)*; Hivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999).  To demonstrate prejudice, he must show that the alleged error resulted in actual harm.  *E.g., Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).   Both cause and prejudice must be established.  *Murray*, 477 U.S. at 494, 106 S.Ct. at 2649.

7
8
9
10
11

Petitioner presents no argument in the Reply directed specifically to the procedural default of Ground 1.  For substantially the reasons discussed, *supra*, as to Ground 2, the Court holds that Petitioner has not demonstrated cause and prejudice on the basis of alleged ineffective assistance of appellate counsel.  Ground 1 thus is procedurally defaulted and provides no basis for federal habeas relief.[44]

12
13

IT THEREFORE IS ORDERED that all remaining claims in the Petition are DENIED and that this action shall be DISMISSED with prejudice.

14
15
16
17
18
19
20
21

IT FURTHER IS ORDERED that a certificate of appealability is DENIED, as jurists of reason would not find the district court's rejection of the claims presented to be debatable or wrong, for the reasons assigned herein.  Ground 2 is discussed before Ground 1 herein.  Petitioner seeks to establish ineffective assistance of appellate counsel in Ground 2 to overcome the procedural default of the underlying substantive *Brady* claim in Ground 1.  As discussed in greater detail, *supra*, Petitioner was not denied effective assistance of appellate counsel when counsel declined to raise the weak and conclusory *Brady* claim alleged in Ground 1.

22

/ / / /

23

/ / / /

24

25
26
27
28

[44]In the Reply, Petitioner refers to a multiple additional circumstances, such as limitations on his access to sundry resources during intervals in which he was down in Las Vegas and held in the jail from which he attempted to escape, alleged insufficiency of the evidence, and a denial of equal protection.  The only exhausted claims properly before the Court are the claims in Grounds 1 and 2 considered herein.  The federal reply may not be used to amend the petition. *E.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994).  The Court has disregarded any *arguendo* attempted claims in the Reply that go beyond the claims in Grounds 1 and 2 that are presented in the Petition and exhausted.

1    The Clerk of the Court shall enter final judgment accordingly in favor of Respondents

2    and against Petitioner, dismissing this action with prejudice.

3        DATED: March 11, 2013.

4

5

6    _____

7    PHILIP M. PRO
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-